IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KAMLESH SHETH,

                                      OPINION and ORDER

                     Plaintiff,

                                           15-cv-315-bbc

       v.

PREMIERBANK, ROY J. BUDLONG,
MARK OLM d/b/a OLM & ASSOCIATES,

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This case arises out of a personal guaranty that plaintiff Kamlesh Sheth gave with respect to financing provided by defendant PremierBank for a hotel. After the borrower defaulted, a third party stepped in to buy the property, but a deficiency remained after the sale, so the bank sued both the borrower and plaintiff in state court to make up the difference. Plaintiff never made an appearance in the case, so the state court entered judgment in the bank's favor, in the amount of approximately $200,000. The bank then began collection proceedings in both Illinois and Wisconsin, eventually recovering the money it says that plaintiff owed.

Now plaintiff is suing not only the bank, but also the bank's executive vice president, Roy Budlong, and the bank's lawyer, Mark Olm, contending that they violated his rights in various ways. (Plaintiff identified "Olm & Associates" as a separate defendant in his complaint, but I have amended the caption because it is undisputed that Olm & Associates

1

is not a separate legal entity, but simply a name under which Mark Olm does business.  Olm PFOF ¶ 5, dkt. #93.)  Plaintiff contends that the bank's lawsuit in state court was a violation of a "settlement agreement" that the parties had and that the bank lulled him into believing that he did not need to participate in the state court lawsuit because the bank had no intention of enforcing the deficiency judgment against him.   In addition, plaintiff contends that defendant Olm violated the law by representing the bank despite his previous representation of plaintiff on related matters in the past.

Plaintiff is asserting claims for breach of contract (against the bank), fraud (against all defendants), tortious interference with a contract (against Budlong and Olm), breach of fiduciary duty (against Olm), violation of Wis. Stat. § 134.01 (against all defendants), common law conspiracy (against all defendants) and malpractice (against Olm).  The bank has asserted a counterclaim against plaintiff, contending that it is entitled under the guaranty to receive reimbursement for all costs and fees it incurred in this case as well as in the state court collections cases.

Because plaintiff is asserting state law claims only, he must show that jurisdiction is present under 28 U.S.C. § 1332, which requires diversity of citizenship between plaintiff and defendants and an amount in controversy more than $75,000. In an order dated August 8, 2016, I asked the parties to provide supplemental materials showing diversity jurisdiction. Dkt. #107.  Having reviewed the parties' supplemental materials, along with the parties' proposed findings of fact, I am persuaded that there is diversity of citizenship (plaintiff is a citizen of Illinois and all defendants are citizens of Wisconsin) and the amount in

controversy is more than $75,000 (because plaintiff is seeking damages well over that amount).

Several motions are before the court: (1) a motion for summary judgment filed by defendants PremierBank and Budlong, dkt. #58; (2) a motion for summary judgment filed by defendant Olm, dkt. #54; (3) plaintiff's motion for partial summary judgment on the bank's counterclaim, dkt. #65; (4) plaintiff's motion for sanctions against the bank and defendant Budlong, dkt. #88; (5) plaintiff's objection to Magistrate Judge Stephen Crocker's May 27, 2016 order, dkt. #89; and (6) defendant Olm's "motion in limine" to bar plaintiff from introducing expert testimony at trial, dkt. #45.

For the reasons explained below, I am (1) granting the motion for summary judgment filed by the bank and defendant Budlong, except as it relates to the bank's counterclaim; (2) granting defendant Olm's motion for summary judgment except as it relates to plaintiff's claim for breach of fiduciary duty; (3) granting plaintiff's motion for partial summary judgment with respect to the bank's counterclaim; (4) denying plaintiff's motion for sanctions; and (5) overruling plaintiff's objection to Magistrate Judge Crocker's May 27, 2016 order. Finally, because defendant Olm's motion in limine relates solely to plaintiff's malpractice claim and I am granting Olm's motion for summary judgment as to that claim, I am denying the motion in limine as moot.

With respect to plaintiff's breach of fiduciary duty claim, I am denying defendant Olm's summary judgment motion because I am rejecting the two arguments he raised, that a lawyer owes no duty of loyalty to a former client and that the statute of limitations has

expired on this claim.  However, I am directing plaintiff to show cause why that claim should not be dismissed on the ground that plaintiff cannot show that he suffered any damages or that Olm breached whatever duty he had.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

## UNDISPUTED FACTS

### A.  Plaintiff's Interest in Whitewater Hotels

Plaintiff Kamlesh Sheth has owned various business since 1980.  In 1989, he acquired an ownership interest in a hotel.  In 1993, he formed Whitewater Hotels, Inc. with two partners.   To date, plaintiff has owned or managed seven different hotels and he has executed approximately 20 guarantees related to those hotels.  Between 2002 and 2007, he was involved in seven different lawsuits.

In the 1990s, plaintiff began banking with defendant PremierBank.  (Because no other banks are relevant to the pending motions, I will refer to defendant PremierBank simply as "the bank" for the remainder of the opinion.)  Over the years, plaintiff obtained financing from the bank several times.

From 1997 to 2007, defendant Mark Olm acted as plaintiff's lawyer in various commercial transactions, including some involving the bank and some involving his ownership interest in Whitewater Hotels.

In 2002, plaintiff executed a stock purchase agreement under which 98% of the stock

for Whitewater Hotels was transferred to Munish Singh and Sonya Singh.  Plaintiff did not own any portion of the company after the sale.

## B.  Plaintiff Signs a Guaranty for the Hotels

In 2006, Whitewater Hotels obtained $1,050,000 in financing from the bank.  As a condition for the loan, plaintiff signed the following personal guaranty:

> For value received, and to induce PremierBank ("Lender "), to extend credit or to grant or continue other credit accommodations to Whitewater Hotels, Inc. ("Debtor"), the undersigned ("Guarantor," whether one or more) jointly and severally guarantees payment of the Obligations defined below when due or, to the extent not prohibited by law, at the time any Debtor becomes the subject of bankruptcy or other insolvency proceedings. 'Obligations' means all loans, drafts, overdrafts, checks, notes, and all other debts, obligations and liabilities of every kind and description, whether of the same or a different nature, arising out of credit previously granted, credit contemporaneously granted or credit granted in the future by Lender to any Debtor, to any Debtor and another, or to another guaranteed or endorsed by any Debtor. Obligations include interest and charges and the amount of payments made to Lender or another by or on behalf of any Debtor which are recovered from Lender by a trustee, receiver, creditor or other party pursuant to applicable federal or state law, and to the extent not prohibited by law, all costs, expenses and attorneys' fees at any time paid or Incurred before and after judgment in endeavoring to collect all or part of any of the above, or to realize upon this Guaranty, or any collateral securing any of the above, including those Incurred in successful defense or settlement of any counterclaim brought by Debtor or Guarantor or incident to any action or proceeding involving Debtor or Guarantor brought pursuant to the United States Bankruptcy Code.

> \* \* \*

> ENTIRE AGREEMENT. This Guaranty is intended by Guarantor and Lender as a final expression of this Guaranty and as a complete and exclusive statement of its terms, there being no conditions to the full effectiveness of this Guaranty. This Guaranty may not be supplemented or modified except in writing. This Guaranty includes additional provisions on the reverse side.

5

(Plaintiff does not say why he chose to guarantee a loan when he had no ownership interest in the property.)  Plaintiff did not seek advice from defendant Olm regarding whether to sign this guaranty and Olm did not represent plaintiff in this transaction.

In late 2006, the bank hired defendant Olm to perform work on its collections and foreclosures.  In 2007, Olm informed plaintiff that he would no longer be representing plaintiff or his businesses.

In 2007, pursuant to the guaranty, the bank required plaintiff to assign his interest in his life insurance policies to the bank.  During the time that Olm represented him, plaintiff did not give Olm any confidential information about his life insurance policies.

### C. Whitewater Hotels Defaults

In December 2009, the bank notified plaintiff that Whitewater Hotels had defaulted on its loan.  In response, plaintiff met with defendant Roy Budlong, an executive vice president for the bank who was in charge of the Whitewater Hotels account. After the meeting, plaintiff agreed either to assume the loan or otherwise make the bank whole in the event of a sheriff's sale.

On January 4, 2010, the bank initiated foreclosure proceedings against Whitewater Hotels.  Defendant Olm was the bank's lawyer in those proceedings.  On January 12, 2010, plaintiff asked the bank to release him from his guaranty, but the bank refused.  On February 15, 2010, defendant Budlong gave plaintiff an estimate of $961,437 to pay off the loan.  Around the same time, plaintiff asked again to be released from his guaranty, but the bank

refused again.

On February 19, 2010, Whitewater Hotels, plaintiff and the bank agreed to modify the loan. (Oddly, none of the parties identify what the modifications were, but neither side suggests that there were any changes to plaintiff's guaranty. Rather, plaintiff admits that the bank still would be looking to him to cover a deficiency in the event of a default. Plt.'s Resp. to Dft.'s PFOF ¶ 33, dkt. #96.) As a result of the modified agreement, the bank suspended its prosecution of the foreclosure action. In August 2010, the bank dismissed the case.

### D.  The Parties Negotiate after Whitewater Hotels Defaults Again

In late 2010, the bank informed plaintiff that Whitewater Hotels had defaulted on the modified loan. In February 2011, plaintiff and the bank began negotiating a resolution. The bank retained defendant Olm to prepare a draft of a settlement agreement. Between February 2011 and May 2011, plaintiff and the bank continued to exchange drafts of an agreement, all of which Olm prepared. Olm had no communication with plaintiff during that time.

In March 2011, plaintiff and the bank discussed the possibility of Whitewater Hotels' agreeing to a receiver and plaintiff's taking responsibility for operating the hotel and covering any deficiency that remained after a sheriff's sale. However, Whitewater Hotels rejected this option.

On March 25, 2011, in an email, defendant Budlong stated that the "current pay off of the loan was $926,649.37 with a per diem of $132.18." In addition, Budlong stated that

the bank had legal fees of less than $2000 and that "the lien releases will take another $2100." Dkt. #83-3 at 30.

On March 31, 2011, the bank initiated a new foreclosure action against Whitewater Hotels. Defendant Olm again represented the bank. The complaint included a statement that the bank was waiving its right to a deficiency judgment. On April 5, 2011, in an email, Budlong told plaintiff that Olm "can't move any further until he receives the signed settlement agreement." On April 13, 2011, the bank amended its complaint to add plaintiff as a defendant. In the amended complaint, the bank removed the waiver and asserted its right to a deficiency judgment. (The parties do not identify the reason for the change.)

On May 18, 2011, plaintiff met with Jim Schafer, a trust officer for the bank with whom plaintiff had a long relationship. Schafer provided plaintiff a copy of the amended complaint and asked plaintiff to sign an admission of service form. (Plaintiff signed the form on June 1, 2011.) Also on May 18, 2011, in an email to defendant Budlong, Schafer reported that he had asked plaintiff to sign the settlement agreement.

On May 19, 2011, plaintiff signed the latest version of the settlement agreement (called "Agreement by Guarantor"), which he had reviewed with a lawyer. Under that agreement, the bank would dismiss plaintiff from the foreclosure action, waive its right to a deficiency judgment and release plaintiff from his guaranty if he "bid $1.00 higher than [the bank's] opening bid [at the sheriff's sale] in order to buy the property from [the bank], which will bid its principal, interest, late charges, receivership costs, other related costs, real estate taxes and costs and attorney's fees." However, "if [plaintiff] fail[ed] to bid at the

Sheriff's Sale, or if the balance of the Sheriff's Sale purchase [was] not paid to the Clerk of Court within 10 days . . . , then [the bank had] the right to sue [plaintiff] for the difference" between the bank's total costs and the price it received at the sale.   In addition, the agreement included the following provision:

> SHETH understands and acknowledges that ATTORNEY MARK T. OLM drafted this Agreement for PREMIER even though he has represented SHETH in past transactions. By signing this Agreement SHETH consents to MARK T. OLM representing PREMIER in this matter and acknowledges and agrees that MARK T. OLM is not representing SHETH'S interests in this matter.

Finally, the agreement included a provision that "[n]o amendments or additions to this Agreement will be binding upon the parties unless reduced to writing and signed by them."

After signing the agreement, plaintiff returned it to the bank through a fax machine, using the number that Schafer had provided.  (It is disputed whether plaintiff called Schafer to confirm that Schafer had received it.)   Neither Budlong nor anyone else at the bank signed the agreement. (Defendants say this was because they were not aware that plaintiff had returned the agreement to them.)  Plaintiff never asked defendants for a signed copy of the agreement and he did not ask them whether they had signed the agreement.  For their part, defendants did not ask plaintiff whether he had returned the agreement and they never made another request for him to sign it.

On June 21, 2011, the bank filed a motion in the foreclosure action for a default judgment against both plaintiff and Whitewater Hotels.  On June 28, 2011, the state circuit court entered a default judgment against all defendants.   (The parties did not submit any proposed findings of fact addressing the question whether plaintiff received a copy of the

motion or judgment.)

On August 1, 2011, in an email to plaintiff, defendant Budlong suggested that they meet to discuss the procedure for the sheriff's sale and an appropriate price.

On August 18, 2011, plaintiff met with defendant Budlong and Schafer to discuss pending offers on the hotel property. On August 25, 2011, in an email to plaintiff, Budlong wrote the following:

> We discussed the offer of $950,000 for the purchase of the Whitewater Hotel and it was agreed by you and the bank to decline the offer. I contacted Munish Singh by email the next day and informed him of the decision to decline the offer. I restated to him that the bank is seeking a price of $1,100,000.
>
> It is your position that your group is at the $1,050,000.00 mark for the purchase of the motel. If a price higher than that amount comes in, we are in agreement to accept it. We will continue discussions regarding any deficiency at that time. . . .
>
> The sheriff sale is scheduled for October 6. It was agreed that, prior to the sheriff sale if no other buyer is accepted, we will finalize in writing the offer from your group so we know what amount to bid at the sheriff sale.

In August 2011, plaintiff met with Ronak Patel for the purpose of marketing the hotel property.

On September 2, 2011, in an email to plaintiff regarding the $950,000 offer, Budlong wrote, "Since you are guarantor on the loan, I need your confirmation regarding the agreement to decline the offer made on the motel."

In September 2011, the bank reached an agreement with Patel's company, SAI Hospitality, to sell the hotel for $1.1 million. They also agreed that the bank would bid that amount at the sheriff's sale and then the bank would transfer the title to SAI for the same

10

amount.  (The parties do not explain why they chose that procedure.)

On September 20, 2011, in an email, defendant Budlong informed plaintiff of the offer and asked for his consent to it.  Plaintiff agreed to accept the offer, but neither Budlong nor plaintiff raised the issue of a potential deficiency.

### E. The Sheriff's Sale and Request for a Deficiency Judgment

On October 6, 2011, the bank bought the hotel at the sheriff's sale for $1.1 million. Plaintiff did not appear at the sale or submit a bid.  On October 7, 2011, the bank filed a motion for a confirmation of sale.  In an affidavit, Olm identified the amount owed to the bank as $1,163,538.78, which meant that there was a deficiency. The amount included the bank's costs for the receivership.

In determining the amount, defendant Olm inserted the numbers that defendant Budlong provided.  Olm did not make any effort to review the accuracy of Budlong's calculations.  Budlong used a per diem of $148.5657, even though the complaint identified the per diem as $132.1833.  (Although plaintiff suggests that the lower per diem was the correct one, he does not support that allegation or otherwise develop an argument that the discrepancy is relevant to any of his claims in this case.)

On October 12, 2011, a copy of the bank's motion for a confirmation of sale was mailed to plaintiff.  (Neither side submitted proposed findings of fact regarding whether plaintiff received the motion, but see United States v. Williams, 796 F.3d 815, 817-18 (7th Cir. 2015) ("Mailing to the correct address suffices [to show receipt.]").)  On November 22,

2011, the circuit court approved the sale and found that $1,163,538.78 was due.

On December 12, 2011, in an email, defendant Budlong informed plaintiff that the bank was "in the process of closing out the receivership and applying for a deficiency judgment." After reviewing this email, plaintiff understood that the bank had incurred a deficiency. (In an affidavit, plaintiff says that he called Budlong and that Budlong told him that "the bank was not going to pursue a deficiency judgment against [him], but only against" the owners of the hotel. Sheth Aff. ¶ 6, dkt. #82.)

In emails in February and March 2012, Budlong and Olm considered whether to enforce the deficiency judgment using plaintiff's life insurance policies. Budlong wrote, "It was decided to wait 2-3 years before we take any action against him. We have another motel relationship with him and we want to get through this motel economic downtown first." (Plaintiff says this email is evidence of defendants' efforts to conceal the judgment from him.)

On March 20, 2012, the bank filed a motion for a deficiency judgment for $209,692.86 against all the defendants in the foreclosure action, including plaintiff. Again, defendant Olm inserted the numbers provided by defendant Budlong without an independent review of their accuracy. The amount proposed by the bank was incorrect because it included a double counting of $78,846 in receivership expenses. (Defendants say this was an inadvertent error.) In 2015, after plaintiff's counsel notified the bank of this error, the bank filed a motion in the circuit court to correct the judgment. (The parties do not say whether the judgment was corrected, but to the extent that any errors remained,

12

plaintiff does not explain how the errors would support any of his claims in this case.)

On March 26, 2012, the bank's motion for judgment was mailed to plaintiff, who received it and reviewed it.  (Plaintiff says that he called Budlong again after reviewing the motion and that Budlong stated that "the bank was only pursuing a deficiency judgment against" the owners of the hotel and that "the bank would neither obtain nor pursue the deficiency judgment against" plaintiff.  Plt.'s Aff. ¶ 7, dkt. #82.)  Plaintiff did not oppose the motion or otherwise respond to it.

On May 9, 2012, the circuit court entered a deficiency judgment of $209,692.86 in favor of the bank and against all the defendants, including plaintiff (Sheth).  Defendants did not send plaintiff a copy of the deficiency judgment entered by the court.  (Plaintiff did not propose any findings of fact regarding whether the court sent him a copy of the judgment.)


### F.  Efforts to Collect the Judgment

Defendants did not discuss the deficiency judgment with plaintiff until November 2013.  On November 25, 2013, in an email to plaintiff, defendant Budlong raised the issue of the judgment after plaintiff asked the bank for financing with respect to another hotel. In particular, defendant Budlong wrote:

> We are interested in assisting you in the conversion of the Fort Atkinson motel but we have an obstacle that will need to be dealt with.  As you are aware, you were a guarantor in the Whitewater Hotel, Inc. Loan.  We incurred a deficiency in the foreclosure of $209,692.  We have had a good relationship in the motel in Fort Atkinson and wish to continue it.  Our board and handlers will probably not allow us to handle your request unless we reach a mutually agreeable settlement on the deficiency judgment. . . .

13

In February 2014, the bank initiated collection proceedings against plaintiff in Illinois state court. Although plaintiff was represented by counsel, he did not challenge the validity of the deficiency judgment in any court filings.

In April 2014, plaintiff contacted Jim Schafer for help. (As noted above, Schafer was a bank officer who had a long relationship with plaintiff.) In an email to defendant Budlong about plaintiff's request, Schafer wrote that he "thought when the Whitewater motel was sold that the sale price covered the previous loan with no loss."

In May 2014, plaintiff called defendant Budlong to ask him why he was pursuing a deficiency in light of their settlement agreement. When Budlong told plaintiff that there was no valid agreement, plaintiff said that he had a signed statement from Budlong promising not to pursue a deficiency against him. Budlong asked plaintiff to send him a copy of the statement, but plaintiff refused. (Plaintiff does not allege now that a signed agreement exists.)

In July 2014, an Illinois state court entered an order stipulated to by the parties in which plaintiff agreed to turn over approximately $3600 to the bank. In September 2014, an Illinois state court directed plaintiff's insurer to turn over approximately $107,000 held under two life insurance policies. In October 2014, the bank initiated garnishment proceedings against plaintiff in Wisconsin state court. Although plaintiff was represented by counsel at the time, he did not make an appearance in the case. In July 2015, the Wisconsin state court ordered garnishee N&N Brothers, Inc. to pay approximately $42,000 to the bank on plaintiff's behalf. Plaintiff did not appeal any of the orders issued by the

Wisconsin or Illinois state courts.

In May 2016, the bank executed a satisfaction of judgment in the foreclosure action.


OPINION

I.  PLAINTIFF'S CLAIMS

A. Procedural Issues

1.  Rooker-Feldman doctrine

In two motions to dismiss filed in June 2015, dkt. ##8 and 11, all of the defendants in this case argued that plaintiff's claims were barred under what is called the Rooker-Feldman doctrine.  Named after Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983), the doctrine is easily summarized. Only the Supreme Court has the authority to review the judgments of state courts in civil litigation, so federal district courts do not have jurisdiction to hear a claim if a state court judgment is the source of the plaintiff's injury.  Harold v. Steel, 773 F.3d 884, 885 (7th Cir. 2014).

In their motions to dismiss, defendants argued that all of plaintiff's claims in this case are collateral attacks on the judgment that the bank obtained against plaintiff in Wisconsin state court, so the Rooker-Feldman doctrine should apply.  In an order dated August 20, 2015, I denied defendants' motions as premature because defendants failed to develop arguments about a number of issues raised in the case law under the doctrine.  These included: (1) whether it is appropriate to apply the Rooker-Feldman doctrine to claims about

lawyer misconduct (which often may include an adverse judgment as an injury), <u>Kamilewicz v. Bank of Boston Corp.</u>, 100 F.3d 1348, 1351 (7th Cir. 1996) (Easterbrook, J., dissenting from denial of rehearing en banc) ("The <u>Rooker-Feldman</u> doctrine . . . does not apply to malpractice suits."); <u>Riddle v. Deutsche Bank National Trust Co.</u>, 599 F. App'x 598, 600 (7th Cir. 2015) (malpractice claim arising out of foreclosure judgment not barred by <u>Rooker-Feldman</u> doctrine because "legal malpractice . . . is separate from the foreclosure process"); and (2) whether the <u>Rooker-Feldman</u> doctrine bars claims against defendants who were not parties in the state court action, such as Budlong and Olm, <u>Kamilewicz</u>, 100 F.3d at 135 (Easterbrook, J., dissenting from denial of rehearing en banc) ("[T]he <u>Rooker–Feldman</u> doctrine does not affect suits by or against persons who were not parties to the initial case."), <u>cited with approval</u> in <u>Arnold v. KJD Real Estate, LLC</u>, 752 F.3d 700, 705 (7th Cir. 2014). (I also raised the question whether the doctrine applied to any challenge by plaintiff to the state court collection proceedings because at least some of those were not yet complete.  Because it appears that the bank has since obtained final orders in all the collection proceedings, that is no longer an issue.)

These questions did not apply to plaintiff's claims against the bank.  Because the state court judgment seemed to be the source of plaintiff's injury with respect to those claims, there seemed to be a strong argument for applying the <u>Rooker-Feldman</u> doctrine.  However, even with respect to those claims, there was some uncertainty because defendants initially ignored <u>Johnson v. Pushpin Holdings, LLC</u>, 748 F.3d 769, 770 (7th Cir. 2014), in which the court stated that the <u>Rooker-Feldman</u> doctrine "does not bar a federal suit that seeks

16

damages for a fraud that resulted in a judgment adverse to the plaintiff. Such a suit does not seek to disturb the judgment of the state court, but to obtain damages for the unlawful conduct that misled the court into issuing the judgment." Id. at 773.  In their reply briefs, defendants cited Iqbal v. Patel, 780 F.3d 728, 730 (7th Cir. 2015), in which the court rejected the view that fraud claims are exempt from the Rooker-Feldman doctrine:

> The Rooker–Feldman doctrine is concerned not with why a state court's judgment might be mistaken (fraud is one such reason; there are many others) but with which federal court is authorized to intervene. The reason a litigant gives for contesting the state court's decision cannot endow a federal district court with authority; that's what it means to say that the Rooker–Feldman doctrine is jurisdictional.

Id. at 729 (citing Harold, 773 F.3d at 886, and  Kelley v. Med–1 Solutions, LLC, 548 F.3d 600 (7th Cir. 2008)).  The court interpreted Johnson narrowly to mean that "federal courts retain jurisdiction to award damages for fraud that imposes *extrajudicial injury*." Id. at 730 (emphasis added).  More generally, the court restated the general rule as follows: "if a plaintiff contends that out-of-court events have caused injury that the state judiciary failed to detect and repair, then a district court has jurisdiction—but only to the extent of dealing with that injury." Id.

Although Iqbal seemed to support dismissal of plaintiff's claims against the bank, defendants did not rely on Iqbal in their opening briefs in support of the motions to dismiss. Because plaintiff did not have an opportunity to identify an "extrajudicial injury" or to explain why the injuries he had identified qualify as one, I told the bank that it could reassert its argument in the context of a summary judgment motion.

Neither defendant Budlong nor defendant Olm argues in his summary judgment

17

briefs that the Rooker-Feldman doctrine applies to him.  Because that is consistent with my tentative conclusion in the order on the motions to dismiss, I need not say anything further about the doctrine as it applies to those defendants.

This leaves the claims against the bank for breach of contract, fraud and conspiracy. As an initial matter, plaintiff asks the court to follow Johnson rather than Iqbal, repeating my observation in the August 20, 2015 order that the language from Iqbal quoted above was dicta because the court in that case concluded that the Rooker-Feldman doctrine did not apply, meaning that its discussion of Johnson was not essential to the holding.

Although there may be some tension between Johnson and Iqbal, the court in Iqbal acknowledged the earlier case and identified a way to interpret its holding without creating a conflict.  Generally, a district court should follow the pronouncements of higher courts, even dicta, particularly in a situation like this one in which the court provided a reasoned explanation for its conclusion.  Reich v. Continental Casualty Co., 33 F.3d 754 (7th Cir. 1994) ("Lower courts will ordinarily be under duty to be guided by United States Supreme Court dictum, which is recent, considers all relevant considerations and adumbrates an unmistakable conclusion; such dictum provides the best, though not infallible, guide as to what the law is.").  Further, as the court noted in Iqbal, interpreting Johnson more broadly would be inconsistent with cases such as Harold and Kelly, in which the courts concluded that the Rooker-Feldman doctrine applied even though the plaintiffs were bringing fraud claims.  Accordingly, I am reading Iqbal as stating the correct view of the law.

In arguing that he suffered an extrajudicial injury, plaintiff says that he "did not

merely lose the assets in the amount of the state court judgment.  In addition to the loss of the policies' cash value and other assets executed on by the Defendants, the pre-litigation and pre-judgment fraud caused Mr. Sheth to lose all benefits of owning the $400,000 and $200,000 life insurance policies."  Plt.'s Br., dkt. #86, at 12.  However, plaintiff does not develop this argument or even explain what he means by it.  Further, he does not cite any evidence that quantifies any loss he sustained beyond the cash value of the polices.  Even if I assume that he did sustain such a loss, he does not explain why he believes the source of that loss is anything other than the state court judgments in the collection proceedings.  Accordingly, I conclude that this argument is forfeited.

Alternatively, plaintiff says that the Rooker-Feldman doctrine does not apply because he did not have a reasonable opportunity to raise his claims in state court.  Long v. Shorebank Development Corp., 182 F.3d 548, 558 (7th Cir. 1999) ("[A]n issue cannot be inextricably intertwined with a state court judgment if the plaintiff did not have a reasonable opportunity to raise the issue in state court proceedings.").  Plaintiff acknowledges the limitation of this exception, which is that "[i]t is not enough for [him] to say that because []he was kept away from the [state] [c]ourt . . . proceeding by the defendants' chicanery, []he was denied a reasonable opportunity to raise h[is] claims before the [state] [c]ourt."  Id.  Rather, plaintiff must point to a barrier imposed by a "state court procedure."  Id.  Thus, for the purpose of applying the Rooker-Feldman doctrine, I cannot consider plaintiff's allegations that the bank lied to him about its intent to enforce the state court judgment and then attempted to conceal the judgment after it was entered.

19

Plaintiff says that the relevant state court procedure was Wis. Stat. § 806.07(2), which imposes a one-year deadline within which a party may bring a motion to vacate a judgment because of another party's fraud or other misconduct. Because plaintiff says that he did not learn about the judgment until that deadline had passed, he did not have a reasonable opportunity to challenge the judgment.

Plaintiff ignores the remainder of § 806.07(2), which states that the deadline does not apply to "an independent action to relieve a party from judgment, order, or proceeding." Walker v. Tobin, 209 Wis. 2d 72, 79–80, 568 N.W.2d 303, 306 (Ct. App. 1997) (§ 806.07(2) authorizes independent action to challenge judgment obtained by fraud and "the only time limitation is the equitable doctrine of laches"). In any event, the exception in Long does not apply to a party's ability to bring a collateral attack. Rather, the question is whether the state court procedure "precluded the litigants from raising their federal claims *during* the state court proceedings." Long, 182 F.3d at 558 (emphasis added). It is undisputed that plaintiff had notice of the deficiency proceeding and that he could have asserted his claims against defendant in that forum, but he chose not to do so. Again, under Long, it is irrelevant whether plaintiff's inaction was a result of defendants' alleged "chicanery."

In sum, I am inclined to agree with the bank that the Rooker-Feldman doctrine bars plaintiff's claims against that defendant. However, plaintiff raises many of the same claims against the other defendants and it is undisputed that the Rooker-Feldman doctrine does not apply to the other defendants, so it is necessary to consider the merits of those claims

20

regardless whether the doctrine applies. Although the bank is the only defendant named with respect to plaintiff's breach of contract claim, that claim is related to other claims against other defendants, such as the claim for tortious interference with a contract. For these reasons and because it will not change the outcome of the motions for summary judgment, I will consider the bank's other arguments as well.

## 2.  Claim and issue preclusion

The bank and defendant Budlong argue that the doctrines of claim and issue preclusion bar plaintiff from suing not only the bank, but defendant Budlong as well. With respect to claim preclusion, the elements are (1) identity of the claims; (2) identity of the parties; and (3) a prior judgment on the merits. Kruckenberg v. Harvey, 2005 WI 43, ¶ 21, 279 Wis. 2d 520, 531, 694 N.W.2d 879, 885. (Because a Wisconsin state court entered the foreclosure judgment, Wisconsin laws on preclusion apply. Czarniecki v. City of Chicago, 633 F.3d 545, 548 n.3 (7th Cir. 2011).)

Defendants acknowledge that plaintiff's claims in this case for breach of contract, fraud, conspiracy and tortious interference with a contract were not litigated in state court. However, defendants cite ABCG Enterprises, Inc. v. First Bank Southeast, N.A., 184 Wis. 2d 465, 471, 515 N.W.2d 904, 906 (1994), for the proposition that claim preclusion applies to counterclaims that a party *should have* brought in previous litigation but failed to do so. In particular, claim preclusion may apply if the claims being raised in both cases arose out of a "common nucleus of operative facts" or "a single transaction" *and* "the [new] action

21

would nullify the initial judgment or impair rights established in the initial action." <u>ABCG Enterprises</u>, 184 Wis. 2d 465 at 480–81, 515 N.W.2d at 910.  In <u>ABCG Enterprises</u>, the court held that claim preclusion applied to claims in which the plaintiff was challenging the validity of mortgage transactions that had been the subject a default judgment in an earlier case with the same parties.  <u>ABCG Enterprises</u>, 184 Wis. 2d 465 at 481–82, 515 N.W.2d at 910.

The analysis in <u>ABCG Enterprises</u> seems to overlap somewhat with the <u>Rooker-Feldman</u> doctrine, so, again, I am inclined to agree that the doctrine applies to plaintiff's claims against the bank.  However, I need not belabor the issue because I am concluding that plaintiff's claims against the bank fail on the merits as well.

I am not persuaded that claim preclusion or issue preclusion bars plaintiff's claims against defendant Budlong.  Again, Budlong was not a party to the state court actions. Although the general rule is that claim preclusion applies to the same parties as well as anyone in privity with the parties, <u>Kruckenberg</u>, 2005 WI 43 at ¶ 21, defendants do not cite any cases in which that rule was applied to a case like this one, in which defendants are arguing that the plaintiff should have brought a *counterclaim* in a previous case.  If I adopted defendants' position, it would require a person being sued not only to assert certain counterclaims against the plaintiff, but also to assert related claims against any nonparty who is in privity with the plaintiff.  Such a rule seems both inefficient and unfair.

Defendants quote the statement from <u>Wickenhauser v. Lehtinen</u>, 2007 WI 82, ¶ 28, 302 Wis. 2d 41, 61, 734 N.W.2d 855, 865, that "there is an identity of parties when the

parties are, for the most part, identical," suggesting that the parties do not have to be the same. However, in <u>Wickenhauser</u> the parties *were* the same with respect to the claim being precluded. <u>Id.</u> at ¶ 29. Thus, the court did not need to consider what "for the most part" means and the court did not hold that a defendant being sued is required to assert claims against nonparties or forever forfeit her right to do so in a separate lawsuit. In the absence of any additional authority or argument from defendants on this issue, I decline to adopt that conclusion.

Issue preclusion clearly does not apply. Defendants devote a lengthy argument to the question whether a default judgment has preclusive effect, but even if I assume that it does, a default judgment may be preclusive only with respect to those issues that were necessarily decided by the first court's judgment. <u>Kelley v. Ahern</u>, 541 B.R. 860, 866 (W.D. Wis. 2015) (citing <u>Heggy v. Grutzner</u>, 156 Wis.2d 186, 456 N.W.2d 845 (Ct. App.1990)). Of course, neither plaintiff nor the bank raised issues about breach of contract or fraud in any of the state court actions, so those issues were not part of the state court judgments.

## C. <u>Merits</u>

### 1. <u>Choice of law</u>

Because all of plaintiff's claims arise under state law, it is state law that I must apply. Both sides assume that Wisconsin law applies, so I will do the same. <u>RLI Insurance Company v. Conseco, Inc.</u>, 543 F.3d 384, 390 (7th Cir. 2008) ("When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the

federal court sits").

2.  Breach of contract (against the bank)

Even if I assume that plaintiff's breach of contract claim against the bank is not barred by the Rooker-Feldman doctrine (or the doctrine of claim preclusion), the claim fails on the merits.  Plaintiff says that the bank promised not to pursue a deficiency judgment against him so long as he found a buyer willing to pay at least $1.1 million for the hotel property.  In addition, plaintiff says that he upheld his end of the bargain by finding Ronak Patel to purchase the property for $1.1 million.  (The bank says that the owners of the hotel found Patel, but I need not resolve that dispute.)  Thus, plaintiff says, the bank breached its agreement when it chose to sue him anyway.

This claim has a fundamental problem: plaintiff has not cited any admissible evidence that he had such an agreement with the bank.  It is undisputed that plaintiff has no signed agreement in which the bank agreed to waive a deficiency under any circumstances.  In fact, the bank refused multiple requests to release plaintiff from his guaranty and bank representatives reminded plaintiff multiple times that he would be responsible for a deficiency.

Plaintiff points to a May 2011 agreement that *he* signed, in which the bank agreed to waive its right to a deficiency judgment in exchange for plaintiff bidding at least one dollar more than the bank at the sheriff's sale.  However, it is undisputed that no representative of the bank ever signed that agreement.  Plaintiff does not develop an argument or cite

24

authority to support a view that other conduct by the bank may be construed as acceptance, but even if I assume that the May 2011 agreement is enforceable, plaintiff admits that the agreement would not help him because he did not comply with its terms.  In particular, under that agreement, the bank retained the right to sue plaintiff for any losses that remained if plaintiff did not bid on the hotel property himself.  It is undisputed that plaintiff did not bid on the property or even appear at the sheriff's sale.  (Plaintiff does not argue that the bank breached the agreement first by failing to dismiss him from the foreclosure action before the sheriff's sale or that, if the bank did breach first, its breach would have any effect on the claims in this case.  Accordingly, I do not consider those matters.)

Rather than relying on any formal agreement, plaintiff argues that the bank's promise not to sue him comes from negotiations that occurred between June and October 2011. Plt.'s PFOF ¶¶ 37-38 and 50, dkt. #98.  In support of this allegation, plaintiff cites ten pages of his deposition testimony and 10 exhibits. Plt.'s Dep., dkt. #51, at 296-305; Affidavit of Ryan Van Osdol, dkt. #83, exhibits 16-25.

It is telling that plaintiff is unable to provide a more specific citation to support such a critical allegation.  A review of the documents confirms that they provide no support for plaintiff's allegation that the bank ever agreed to waive its right to pursue a deficiency judgment against him if he found another buyer.  Most of the exhibits plaintiff cites are the emails discussed in the undisputed facts section of this opinion.  These emails include discussions of the offers being made on the hotel property, but in none of the emails does defendant Budlong or any other bank representative agree to a modification.  The only other

25

exhibits are a statement from Patel that he is going to bid $1.1 million on the property and the closing statement of the sale. Neither of those documents includes any promises by the bank to plaintiff.

Even in his deposition testimony, plaintiff does not point to a particular document or conversation in which the bank agreed not to seek a deficiency judgment against him if he found a buyer who paid at least $1.1 million for the property. All he says is that it was his "understanding" that $1.1 million "would make the bank whole." Plt.'s Dep., dkt. #52, at 303. Even if I assume that was a reasonable inference to draw from the bank's failure to make a clearer statement to the contrary, plaintiff's personal belief that the bank would not suffer a deficiency is a far cry from an agreement by the bank not to sue plaintiff if there was a deficiency. Skycom Corp. v. Telstar Corp., 813 F.2d 810, 814–15 (7th Cir. 1987) ("Like most other states, Wisconsin takes an objective view of 'intent' [in the context of contract interpretation]. The intent of the parties to be bound must necessarily be derived from a consideration of their words, written and oral, and their actions. Secret hopes and wishes count for nothing.") (internal citations, quotations and alterations omitted).

Perhaps the bank could have more emphatically communicated its position that plaintiff would remain on the hook for any deficiency that remained after the sale, but the bank had no legal obligation to remind plaintiff of what was clearly spelled out in their written agreements, including the May 2011 agreement. If plaintiff believed that a $1.1 million offer was enough to immunize him from any liability, he was free to ask the bank to so stipulate. However, plaintiff cites no evidence that he even asked the bank whether there

would be a deficiency, let alone tried to elicit a promise not to sue him.  In his August 25, 2011 email, defendant Budlong stated, "[w]e will continue discussions regarding any deficiency" after there is an accepted offer.  If plaintiff were concerned about potential liability, that statement alone should have been enough to prompt him to seek a stipulation or at least a clarification.

In his deposition, plaintiff says that he and the bank changed their agreement through "communications by email, in person and on the phone," dkt. #51 at 303, but the only emails or conversations he identifies are the ones described in this order, none of which show that the bank agreed to a modification.  To the extent he is referring generally to other conversations not identified in the record, his testimony does not suffice.  Drake v. Minnesota Mining & Manufacturing Co., 134 F.3d 878, 887 (7th Cir.1998). ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").  Further, both the May 2011 agreement and previous agreements required changes to be made in writing, a provision that plaintiff does not challenge.  Because plaintiff does not identify any written modification to his agreement with the bank, that is reason alone to dismiss plaintiff's breach of contract claim.

Plaintiff relies on an April 2014 email to defendant Budlong from Jim Schafer, another bank employee involved in the negotiations.  Schafer wrote that he "thought when the Whitewater motel was sold that the sale price covered the previous loan with no loss." Plaintiff calls  this email "an admission," but of what he does not say.  To the extent that

plaintiff means to argue that Schafer was "admitting" that the bank modified its agreement with plaintiff and that the bank should be bound by that admission, that argument is untenable. Schafer's email may support the reasonableness of the assumption that plaintiff made, which is that a $1.1 million sale would be enough to avoid a deficiency. However, as explained above, a belief about the existence or absence of a deficiency and a modification to the agreement are not the same thing. Schafer does not state or imply in his email that the bank ever agreed not to sue plaintiff if a buyer paid at least $1.1 million for the property, so the email does not support plaintiff's breach of contract claim.

Alternatively, plaintiff devotes one paragraph to an argument that the bank breached its duty of good faith and fair dealing. Beidel v. Sideline Software, Inc., 2013 WI 56, ¶ 27, 348 Wis.2d 360, 842 N.W.2d 240 ("Every contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties.") (internal quotations omitted). However, that duty cannot create an agreement that did not exist or modify an existing one. Id. at ¶ 29 ("A party may not . . . employ the good faith and fair dealing covenant to undo express terms of an agreement."). Because plaintiff fails to develop any argument that defendants breached any duty of good faith with respect to existing agreements, the bank is entitled to summary judgment on this claim as well.

3.   Fraud (against all defendants)

a. Defendants PremierBank and Budlong

Plaintiff's theory of fraud is that the bank and defendant Budlong falsely represented

to him that they would not try to obtain or enforce a deficiency judgment against plaintiff and that he relied on those representations when he decided not to defend himself in the state court proceedings. Defendants argue that plaintiff failed to plead this claim with particularity under Fed. R. Civ. P. 9(b), but the time for raising that argument was in their motion to dismiss. Federal pleading rules are about giving proper notice to defendants so that they can prepare a defense. Once the parties have conducted discovery and prepared their summary judgment materials, defendants cannot argue plausibly that the complaint failed to provide proper notice. 5A Wright & Miller, Federal Practice and Procedure § 1300 (3d ed. 2004 ) ("Several federal courts have properly held that a party who fails to object to the manner in which fraud or mistake is pleaded waives the specificity requirement set out in Rule 9."); Milan v. Colvin, No. 09–3666 (DWF/TNL), 2011 WL 1988205, at *5 (D. Minn. May 20, 2011) (refusing to consider defendant's Rule 9(b) argument because it was not made until summary judgment). United National Records, Inc. v. MCA, Inc., 609 F. Supp. 33, 38–39 (N.D. Ill.1984) (same).

Defendants' stronger argument is their second one, which is that plaintiff cannot prove that any reliance on their alleged misrepresentations was justified. State v. Abbott Laboratories, 2012 WI 62, ¶ 52, 341 Wis. 2d 510, 541–42, 816 N.W.2d 145, 161 (one element of common law fraud claim is "justifiable reliance"); Bender v. Town of Kronenwetter, 2002 WI App 284, ¶ 27, 258 Wis. 2d 321, 334–35, 654 N.W.2d 57, 63 (same). This is a strong argument because it is undisputed that plaintiff knew that the bank was suing him. In particular, plaintiff admits that he became aware no later than June 1,

29

2011, that he was a defendant in the foreclosure action; no later than December 12, 2011, he became aware that there was a deficiency after the sale; and, around March 26, 2012, he became aware that the bank had filed a motion for a deficiency judgment against him.

Despite this knowledge, plaintiff says that he took no action to protect his legal interests because of two alleged telephone conversations he had with defendant Budlong, one that occurred after the December 2011 email and one that occurred after he received the motion for a deficiency judgment.  Plaintiff alleges that he did nothing because, during both conversations, Budlong told him that the bank was not going to pursue a deficiency judgment against him.

Even if plaintiff's allegation about defendant Budlong's assurances is true, it seems inexplicable that a sophisticated business person such as plaintiff would do nothing to verify Budlong's statements.  After all, if the bank had no intent on seeking a deficiency judgment against plaintiff, why had plaintiff been named as a party in the first place?  Despite this obvious inconsistency between Budlong's alleged statement and the objective facts, plaintiff did not make an appearance in the state court action, elicit a promise from the bank to dismiss its claim against him or even check the status of the case at a later date so that he could determine whether the claim against him had been dismissed.

It is particularly puzzling why plaintiff would continue to sit back and do nothing after he received the motion for a deficiency judgment in March 2012.  Under plaintiff's own version of events, at that point, defendant Budlong's earlier representation that the bank was not going to pursue a deficiency judgment against plaintiff had proven to be

untrue.  If plaintiff knew that Budlong had already lied to him, why on earth would plaintiff take at face value a representation that the bank was not going to enforce a judgment against him, especially when judgment was imminent and Budlong made no promise to remove plaintiff from the case?  Plaintiff's inaction under that version of the facts is not only unjustified, it is mind boggling.

Plaintiff neither denies that justifiable reliance is an element of his fraud claim nor develops an argument that his reliance was justified.  Accordingly, I see no reason to discuss this issue further.  I am granting the bank's and defendant Budlong's motion for summary judgment as to the fraud claim.

b.  Defendant Olm

In his complaint, plaintiff's theory of fraud against defendant Olm was the same as his theory against the other defendants.  To the extent that plaintiff means to sustain the same theory against Olm, the claim fails for the reasons described above. However, in his summary judgment brief, plaintiff raises a new theory, which is that Olm made misrepresentations in state court filings, such as by including an incorrect per diem amount in the motion for judgment for foreclosure, including receivership expenses to which the bank was not entitled and submitting an affidavit that inflated the amount plaintiff owed the bank. Even if I assume that plaintiff did not forfeit this claim by failing to include it in his complaint and even if I assume that the cited representations can be attributed to Olm (rather than the bank), the claim fails on its face because plaintiff does not argue that he was

deceived by any of these alleged misrepresentations, let alone that he relied on them. Rather, plaintiff's theory is that Olm deceived the state court. Although that might be grounds for a sanction by the state court, it does not provide grounds for plaintiff to sue Olm.

4. <u>Conspiracy (against all defendants)</u>

Plaintiff asserts two different legal theories of conspiracy. First, under Wis. Stat. § 134.01, a party may be held liable if he satisfies four elements: (1) the defendants acted together, (2) with a common purpose to injure the plaintiff's reputation and business, (3) with malice and (4) the acts financially injured the plaintiff. WIS JI Civil–2820.

A common law conspiracy claim requires a showing of "concerted action [by the defendants] to accomplish some unlawful purpose or upon concerted action to accomplish some lawful purpose by unlawful means." <u>Onderdonk v. Lamb</u>, 79 Wis. 2d 241, 246-47, 255 N.W.2d 507, 509-10 (1977). "An allegation of a [common law] conspiracy is not so much a separate 'claim' as it is a mechanism for holding defendants liable for wrongful conduct." <u>Zimmerman v. Logemann</u>, 2009 WL 4407205, *10 (W.D. Wis. 2009). Thus, to prevail on a common law claim, the plaintiff must show that the defendants acted together to commit an underlying tort. <u>Taurus IP v. DaimlerChrysler Corp.</u>, 519 F. Supp. 2d 905, 928 (W.D. Wis. 2007) ("[A] civil conspiracy requires an underlying tort.") (citing <u>Segall v. Hurwitz</u>, 114 Wis. 2d 471, 481, 339 N.W.2d 333, 338 (Ct. App.1983)).

With respect to the statutory claim, defendants argue that plaintiff cannot meet the

32

requirement for "malice," which is defined as an irrational desire to "to cause harm for harm's sake." <u>Maleki v. Fine-Lando Clinic Chartered, S.C.</u>, 162 Wis. 2d 73, 86, 469 N.W.2d 629, 634 (1991). In this case, defendants say that their purpose was a rational desire to collect the full amount owed to them. With respect to the common law claim, defendants make a similar argument that they had a lawful purpose of obtaining a deficiency judgment.

Plaintiff does not respond directly to either of these arguments, but simply repeats his argument that defendants intended to defraud him. Because I have concluded that plaintiff's fraud claim fails, he cannot repackage the same claim under a conspiracy theory.

5. <u>Tortious interference with a contract (against defendants Budlong and Olm)</u>

Plaintiff's tortious interference claim is contingent on a finding that the bank agreed not to pursue a deficiency judgment against him if he found a buyer willing to pay at least $1.1 million for the property. Because I have concluded that plaintiff has not adduced any evidence of such an agreement, his tortious interference claim fails as well.

6. <u>Malpractice (against defendant Olm)</u>

Plaintiff does not identify clearly what conduct by defendant Olm he believes qualifies as malpractice, but the basis for the claim appears to be Olm's decision to represent the bank despite his previous representation of plaintiff. Olm's primary argument regarding this claim is straightforward: he cannot be held liable because he was not acting as plaintiff's lawyer during the relevant time period. <u>Hicks v. Nunnery</u>, 2002 WI App 87, ¶ 33, 253 Wis. 2d

721, 746, 643 N.W.2d 809, 820 (existence of lawyer-client relationship is one element of legal malpractice claim).  It is undisputed that Olm did not serve as plaintiff's lawyer after 2007, several years before the parties' dispute in this case arose.  Although Olm recognizes that a nonclient can sue a lawyer for fraud, Green Spring Farms v. Kersten, 136 Wis. 2d 304, 307, 401 N.W.2d 816, 817 (1987), a fraud claim would fail for the reasons described above.  In addition, Olm argues that plaintiff cannot prevail on a malpractice claim because he does not have any expert testimony, which is needed to show that Olm did not comply with professional standards.

Defendant Olm's first argument makes obvious sense.  The premise of a malpractice claim is that the lawyer failed to provide competent legal representation *to the plaintiff* bringing the malpractice claim.  Peck v. Meda-Care Ambulance Corp., 156 Wis. 2d 662, 669, 457 N.W.2d 538, 541 (Ct. App. 1990) ("An attorney performing legal services for a client has a duty to exercise a reasonable degree of professional care, skill, and knowledge.").  If, at the time of the alleged malpractice, the lawyer was not representing the plaintiff, it is difficult to see how the lawyer could be accused of providing inadequate legal assistance at that time.

In his opposition brief, plaintiff cites no authority for the counterintuitive view that a former client can bring a malpractice claim for the work the lawyer performed for a new client.  In fact, plaintiff does not respond directly to Olm's argument that a malpractice claim requires a lawyer-client relationship at the time of the alleged malpractice.  Again, this failure to respond is sufficient reason to grant Olm's summary judgment motion with respect

34

to this claim.

Instead of a providing a direct response, plaintiff argues that Olm violated Wisconsin Supreme Court Rule 20:1.9, which places restrictions on a lawyer's ability to represent a client on a matter that is "substantially related" to the representation of a former client. He then cites Peck, 156 Wis. 2d 662, 457 N.W.2d 538, for the proposition that a violation of an ethics code provision can be the basis for a malpractice claim.

Plaintiff's reliance on Peck is misplaced. In that case, the court did not hold that a former client could bring a malpractice claim any time a lawyer violates an ethical rule. In fact, the court did not purport to change the elements of a malpractice claim in any way. Rather, the court made it clear that a lawyer's ethical obligations under the supreme court rules are *not* the same as a lawyer's duty to his client under the common law of malpractice. Peck, 156 Wis. 2d at 669, 457 N.W.2d at 541 ("Although the Code of Professional Responsibility established the norms of required professional conduct for attorneys, it did not, by its express terms, undertake to define standards for civil liability of lawyers."). See also SCR 20, Scope ("Violation of a rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached."). Although a violation of an ethical rule can serve as the basis for a malpractice claim, the plaintiff still must satisfy all the elements of such a claim, including the existence of a lawyer-client relationship. Peck, 156 Wis. 2d at 673, 457 N.W.2d at 543 ("The violation of an ethics-code provision does not result in liability to a client unless a duty to that client has been breached and there is resulting damage.").

35

In sum, in the absence of any authority allowing a former client to assert a claim for malpractice, I am granting defendant Olm's summary judgment motion as to plaintiff's malpractice claim.  This makes it unnecessary to consider defendant Olm's alternative argument that the malpractice claim fails because plaintiff does not have an expert.

7.  Breach of fiduciary duty (defendant Olm)

The basis for plaintiff's breach of fiduciary duty claim is the same as plaintiff's malpractice claim, so the first question is whether, under Wisconsin law, a lawyer retains a fiduciary duty to a former client.  Plaintiff says a lawyer retains such a duty; Olm says he does not.  However, neither party cites any authority in support of his respective views.  In my own research, I uncovered a case in which the Wisconsin Supreme Court discussed the issue.  Groshek v. Trewin, 2010 WI 51, ¶ 14, 325 Wis. 2d 250, 261, 784 N.W.2d 163, 168 (noting argument that "agency law and rules of professional conduct impose an obligation on [a lawyer] not to use information against a former client, and that those principles support a finding that [the lawyer] had a continuing fiduciary duty to the [former clients] even if the attorney-client relationship had ended").  However, the court did not resolve the question because it concluded that an attorney-client relationship existed at the relevant time.

There is a plausible argument that a lawyer retains some duty of loyalty to a former client.  Otherwise, a lawyer could use the attorney-client relationship to learn confidential information about the client and then simply terminate the relationship in order to use that

36

information to the detriment of the former client.  Accordingly, in the absence of any controlling or persuasive authority to the contrary, I decline to dismiss the breach of fiduciary duty claim on the ground that Olm retained no duty of loyalty to plaintiff after their relationship ended.

Defendant Olm's only other argument devoted expressly to plaintiff's breach of fiduciary duty claim is that plaintiff filed the claim after the three-year statute of limitations expired.  However, plaintiff argues in his opposition brief that Olm forfeited a statute of limitations defense by failing to plead it.  Olm does not address this issue in his reply brief, so I assume that he has abandoned the argument.

Although I am denying Olm's summary judgment motion as to this claim, that does not mean that it is appropriate to allow the claim to proceed to trial. A substantial question remains whether plaintiff can show that defendant Olm breached whatever duty of loyalty that remained and whether plaintiff suffered any damages as a result of a breach.  Berner Cheese Corp. v. Krug, 2008 WI 95, ¶ 40, 312 Wis. 2d 251, 270, 752 N.W.2d 800, 809 ("The elements of a claim for breach of fiduciary duty are: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that duty; and (3) the breach of duty caused the plaintiff's damage.").

In his brief, plaintiff says that Olm breached his fiduciary duty by "obtaining the deficiency judgment," Plt.'s Br, dkt. #80, at 12, suggesting that plaintiff believes that Olm violated his duty simply by representing the bank in the foreclosure proceeding.  Setting aside the waiver that plaintiff signed regarding Olm's representation of the bank, plaintiff's

argument would be plausible only if Olm's previous representation of plaintiff gave the bank an advantage in the foreclosure proceedings.  Cf. Berner Cheese Corp., 2008 WI 95 at ¶ 41, ("An attorney may breach that duty [of loyalty] when he enters into a transaction with his client without fully informing the client of the risks that the transaction will potentially benefit the attorney and will potentially disadvantage the client.").  Although plaintiff says that the foreclosure proceedings were substantially related to Olm's prior representation of him, he does not identify any information that Olm obtained during that representation that would have been of any use to the bank.  Plaintiff alleges generally that Olm "gained knowledge of [plaintiff's] personal assets," Plt.'s Br., dkt. #80, at 8; Plt.'s Dep., dkt. #51, at 312, but he does not identify any particular "knowledge" that Olm acquired, let alone knowledge that harmed plaintiff in his legal dispute with the bank, or even *could have* harmed plaintiff.  For example, it is undisputed that Olm had no knowledge of plaintiff's life insurance policies.

Alternatively, plaintiff says that, because of his prior relationship with defendant Olm, plaintiff "placed a great deal of trust in the representations that were made to him regarding the settlement agreement, the modification to the terms of the settlement and that the Bank Defendants would not obtain a deficiency judgment."  Plt.'s Br., dkt. #80, at 9. This argument is a nonstarter because plaintiff points to no evidence that *Olm* used his prior relationship with plaintiff to attempt to dissuade him from taking action after the bank sued him.  In fact, it is undisputed that Olm had *no* communication with plaintiff during the relevant time, other than through documents filed in state court.  Thus, regardless whether

defendant Budlong made misrepresentations to plaintiff, those misrepresentations cannot be described as a breach of any duty that Olm owed to plaintiff.

In sum, I see no way that plaintiff can prove either that defendant Olm breached a fiduciary duty to him or that he suffered any harm as a result of a breach.   Although both sides discussed issues related to breach and damages in their briefs, Olm did not expressly identify these issues as a ground for granting summary judgment on the plaintiff's breach of fiduciary duty claim.  Accordingly, I will give plaintiff an opportunity to show that summary judgment should not be granted on this claim.   Fed. R. Civ. P. 56(f) (court may grant summary judgment on its own motion after giving notice and a reasonable time to respond).


## II.  PLAINTIFF'S MOTION FOR SANCTIONS

Plaintiff brings a motion for sanctions under Fed. R. Civ. P. 37 on the ground that defendant Budlong and the bank intentionally withheld various emails from plaintiff until late May 2016.   Plaintiff says that he was prejudiced by the delay because he did not have sufficient time to review the emails before deposing the authors of the emails.  In response, defendants deny that they withheld discovery intentionally and they offer to make any relevant witnesses available for additional depositions.  Having reviewed both sides' briefs, I am denying the motion because I see no way that plaintiff was prejudiced by any untimely production of documents.

In his motion, plaintiff identifies three emails that defendants failed to produce when he first requested them: (1) an April 2014 email in which Jim Schafer wrote to defendant

Budlong that he "thought when the Whitewater motel was sold that the sale price covered the previous loan with no loss"; (2) a May 18, 2011 email from Schafer to Budlong in which Schafer reported that he asked plaintiff to sign the settlement agreement; and (3) a July 2014 email from the bank's board chairman in which the chairman responded to a statement by defendant Olm that he was seeking summary judgment in one of the garnishment proceedings against plaintiff; the chairman wrote, "that would be GREAT, and a 'nice' surprise for our Indian friend." (Plaintiff says that there were many other documents that he received late, but these are the only ones he identifies as relevant to his claims.)

Plaintiff's assertion that he was prejudiced by defendants' untimely production of these documents is unsupported. He cited each of these emails in his proposed findings of fact, so he received them in time to incorporate them into his summary judgment submissions. Further, plaintiff does not argue either that there are documents included in the production that he was unable to review in time or that he believes there are additional documents that defendants are still withholding.

Although plaintiff says that he was prejudiced because he was unable to incorporate questions about the emails into his counsel's deposition questions, it is telling that he does not seek permission to take any additional depositions now. Instead, most of plaintiff's proposed sanctions are directed to disadvantaging defendants at trial by providing adverse jury instructions or prohibiting defendants from contesting various key issues. Plaintiff does not even attempt to explain how these proposed sanctions are tailored to the alleged discovery violation.

In any event, I conclude that defendants' delay in producing the documents was harmless because none of the cited documents provide support for plaintiff's claims and could not have led to probative deposition testimony.  I discussed the April 2014 email above and need not explain again why it does not qualify as an "admission" that the bank breached its contract with plaintiff.

Plaintiff says that the May 18, 2011 email shows that defendants knew that plaintiff had returned a signed a copy of the May 19, 2011 settlement agreement.  Presumably, plaintiff believes that such knowledge would support a finding that the agreement is enforceable, though plaintiff does not develop that argument.  However, as discussed in the context of plaintiff's breach of contract claim, even if I assume that the agreement is valid, it does not support plaintiff's claim because plaintiff is relying on alleged modifications to that agreement rather than the agreement itself.  Thus, it is simply irrelevant whether there was an offer and acceptance of the proposed settlement agreement.

Finally, plaintiff does not identify in his motion any particular relevance of the July 2014 email from the bank's chairman.  In his proposed findings of fact, plaintiff says that the reference in the email to his Indian ancestry is evidence of defendants' "discriminatory" attitude.  Plt's PFOF ¶ 85, dkt. #81. Plaintiff's ancestry had no relevance to the litigation between the parties, so it is puzzling why the chairman chose to mention it.  However, plaintiff cites no evidence that the chairman had anything to do with the decisions that are relevant to this case.  Even if he did and even if I assume that the comment shows a discriminatory attitude, plaintiff does not explain how that fact could help him prove any

41

of his claims.

Accompanying plaintiff's motion for sanctions is an objection to Magistrate Judge Stephen Crocker's decision denying plaintiff's motion for an extension of time to file his summary judgment materials in light of defendants' late production of documents. Because I have concluded that plaintiff has failed to show any prejudice caused by that late production, I am overruling plaintiff's objection as moot.


## III.  DEFENDANT PREMIERBANK'S COUNTERCLAIM

The bank has asserted a counterclaim under plaintiff's personal guaranty.  In particular, the bank contends that it is entitled under the language of the guaranty to the fees and costs it incurred in this case as well as the fees and costs it incurred in the collection actions.  Both plaintiff and the bank have moved for summary judgment on the counterclaim.

In its brief in response to plaintiff's motion, the bank withdraws its counterclaim with respect to any fees and costs it incurred in prior proceedings.  Dfts.' Br., dkt. #78, at 4. Accordingly, I will grant plaintiff's motion for summary judgment as to that aspect of the counterclaim.

This leaves the bank's request for costs and fees in this case.  Under the guaranty, the bank is entitled to

> expenses and attorneys' fees at any time paid or Incurred before and after judgment in endeavoring to collect all or part of any of the above, or to realize upon this Guaranty, or any collateral securing any of the above, including those Incurred in successful defense or settlement of any counterclaim brought

42

by Debtor or Guarantor or incident to any action or proceeding involving Debtor or Guarantor brought pursuant to the United States Bankruptcy Code.

Dkt. #59-5.

As far as plaintiff is concerned, this language applies to three types of claims: (1) claims in an action brought by the bank to enforce plaintiff's guaranty; (2) counterclaims raised by plaintiff in the same type of action; and (3) claims in an action brought "pursuant to the United States Bankruptcy Code." This lawsuit falls within none of those categories.

The bank argues that plaintiff *should have* asserted the claims in this case as counterclaims in the state court action, so the language of the guaranty applies. However, on its face, the guaranty applies to a "counterclaim" brought by plaintiff, not a "claim that should have been brought as a counterclaim." Particularly because the bank cites no authority to support its expansive interpretation of the guaranty and generally contracts are construed against the drafter, Jones v. Jenkins, 88 Wis. 2d 712, 722, 277 N.W.2d 815, 819 (1979), I am denying the bank's motion for summary judgment and granting plaintiff's with respect to the bank's counterclaim.


ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by defendants PremierBank and Roy Budlong, dkt. #58, is DENIED with respect to the bank's counterclaim against plaintiff Kamlesh Sheth. The motion is GRANTED as to all of plaintiff's claims against the bank and Budlong.

2. Defendant Mark Olm's motion for summary judgment, dkt. #54, is DENIED with respect to plaintiff's claim for breach of fiduciary duty.  The motion is GRANTED in all other respects.

3. Plaintiff's motion for partial summary judgment on the bank's counterclaim, dkt. #65, is GRANTED.

4. Plaintiff's motion for sanctions against the bank and defendant Budlong, dkt. #88, is DENIED.

5. Plaintiff's objection to Magistrate Judge Stephen Crocker's May 27, 2016 order, dkt. #89, is OVERRULED.

6. Defendant Olm's "motion in limine" to bar plaintiff from introducing expert testimony at trial, dkt. #45, is DENIED as moot.

7. Plaintiff may have until August 26, 2016, to show cause why summary judgment should not be granted to defendant Olm on the breach of fiduciary duty claim because plaintiff cannot show that he suffered damages or that Olm breached a duty to plaintiff. Defendant Olm may have until August 29, 2016, to file a response.  Plaintiff may have until September 1, 2016, to file a reply.  Plaintiff's and defendant Olm's pretrial deadlines remain in force until this claim is resolved.

Entered this 22d day of August, 2016.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge